**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **OGI GROUP CORPORATION,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No. 19-cv-2619 (APM)** |
| ) | |
| **OIL PROJECTS COMPANY OF** ) | |
| **THE MINISTRY OF OIL, BAGHDAD,** ) | |
| **IRAQ (SCOP),** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

Petitioner OGI Group Corporation ("OGI Group") brings this action to enforce a 2017 arbitration award returned against Oil Projects Company of the Ministry of Oil, Baghdad, Iraq (SCOP) ("SCOP") issued by the International Chamber of Commerce ("ICC") in Paris, France. The ICC tribunal awarded OGI Group $9.6 million in damages, $1.3 million in costs, and 3% interest.  The parties agree that Respondent SCOP still owes OGI Group $1,410,647.52 of that award.

SCOP now moves to dismiss OGI Group's Petition to Confirm an Arbitration Award on the grounds that this court lacks personal jurisdiction over SCOP and that the District of Columbia is an improper venue for the Petition.

For the reasons that follow, the court grants Respondent's Motion to Dismiss the Petition to Confirm an Arbitration Award, both for want of personal jurisdiction and improper venue.

## II.    BACKGROUND

### A.    Factual Background

In 2005, OGI Group entered a $177 million contract with SCOP, an Iraqi-owned state corporation, to assist in developing the Hamrin Oil Field in Iraq.  Pet. to Confirm Arbitration Award, ECF No. 1 [hereinafter Pet.], ¶¶ 3, 10–11, 13.  OGI Group, a Canadian engineering firm, was commissioned "to provide design, engineering, procurement and other services" to support Respondent's construction of "degassing stations and a central treatment plant . . . as well as [to] lay flow lines, gas injection lines and interconnection lines" at the Hamrin Oil Field.  *Id*. ¶ 11.

As relevant here, the contract between OGI Group and SCOP contained an arbitration clause specifying that "[a]ll disputes arising out of or in connection with the Contract for the Development of the Hamrin Oilfield, Iraq" are subject to binding arbitration with the ICC.  *Id*. ¶ 16; Decl. of Steven Jones in Supp. of Pet. to Confirm Award, ECF No. 5 [hereinafter Jones Decl.], Ex. A, ECF No. 5-1 [hereinafter Contract], at 32–33.[1]  The arbitration clause also identified Geneva, Switzerland, as the seat of arbitration and called for all proceedings to be conducted in English, using the substantive law of Iraq.  Pet. ¶ 16; Contract at 33.

Between 2008 and 2013, the parties' relationship devolved as a result of disputes over OGI Group's performance of the contract.  SCOP maintained "that not only the engineering, but also the supply of materials and equipment" that OGI Group provided were "incomplete and deficient." Jones Decl., Ex. C, Final Award, ECF No. 7, ¶ 130.  SCOP subsequently stopped paying OGI Group's invoices.  *Id*.  OGI Group forcefully contested these allegations and argued that SCOP had accepted and approved its materials and equipment as delivered.  *Id*. ¶ 131.

---

[1] The original arbitration clause was amended as written above in 2015.  Pet. ¶ 15.

After years of disagreement, OGI Group filed a Request for Arbitration with the ICC in April 2015. Pet. ¶¶ 17–18. The parties participated in an arbitration hearing in October 2017, and the ICC tribunal ultimately awarded OGI Group $9,638,836.52 in damages, $1,285,463.84 in costs, and 3% interest. *Id*. ¶¶ 26–28. SCOP has since paid the majority of the award, but the parties agree that $1,410,647.52 remains outstanding. Pet.'s Mem. of Law in Opp'n to Resp't's Mot. to Dismiss, ECF No. 20 [hereinafter Pet.'s Opp'n], at 6; Resp't's Reply Mem. in Further Supp. of Resp't's Mot. to Dismiss, ECF No. 23, at 13.

### B.     Procedural Background

Following the ICC tribunal's decision, SCOP filed an Application for Correction of Award with the ICC and an appeal in the Federal Supreme Court of Switzerland requesting that the award be vacated. Pet. ¶¶ 29–31. Both appeals were denied. *Id*. ¶¶ 32–33.

OGI Group originally sought to obtain the remaining balance from SCOP by filing a petition to confirm the arbitration award in the Southern District of New York, *OGI Grp. Corp. v. Oil Projects Co. of the Ministry of Oil, Baghdad, Iraq (SCOP)*, No. 1:19-cv-3432-JSR (S.D.N.Y.), but voluntarily dismissed that action before the court made any substantive rulings, Notice of Vol. Dismissal, *OGI Grp. Corp.*, No. 1:19-cv-3432-JSR (S.D.N.Y.), ECF No. 18. OGI Group subsequently refiled the petition before this court. *See* Pet. SCOP now moves to dismiss on the grounds that this court lacks personal jurisdiction over it and that venue in the District of Columbia is improper. *See* Resp't's Mot. to Dismiss Pet. to Confirm Arbitration Award, ECF No. 19 [hereinafter Resp't's Br.].

## II.    LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears "the burden of establishing the court's personal jurisdiction over" a defendant. *FC Inv. Grp. LC*

*v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008). "To meet this burden, a plaintiff must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations." *Frost v. Cath. Univ. of Am.*, 960 F. Supp. 2d 226, 231 (D.D.C. 2013) (internal quotation marks omitted). "While the district court may consider materials outside the pleadings . . . , the court must still 'accept all of the factual allegations in [the] complaint as true.'" *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)).

Likewise, on a motion to dismiss for improper venue under Rule 12(b)(3), it is the plaintiff's burden to establish that venue is proper, and the court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Gage v. Somerset County*, 322 F. Supp. 3d 53, 56 (D.D.C. 2018).

## III.    DISCUSSION

The primary question in this dispute is whether the court may maintain personal jurisdiction over SCOP consistent with the Due Process Clause. Resolving that issue involves answering three subsidiary questions: (1) whether SCOP is an instrumentality of Iraq; (2) if it is an instrumentality of Iraq, whether OGI Group has alleged facts sufficient to overcome the presumption that SCOP is juridically distinct from Iraq; and (3) if SCOP is to be treated separately from Iraq, whether SCOP has sufficient minimum contacts with the United States of America to render personal jurisdiction over SCOP consistent with due process.[2] The court addresses each of these questions in turn and concludes that SCOP does enjoy the protections of the Due Process Clause, and that

---

[2] "In actions under the Foreign Sovereign Immunities Act, the relevant frame of reference for the minimum contacts analysis is the United States as a whole, rather than the specific jurisdiction in which the suit is filed (here, the District of Columbia)." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 810 n.3 (D.C. Cir. 2012); *see also Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 127 & n.* (D.C. Cir. 1999).

SCOP lacks sufficient minimum contacts with the United States for the court to exercise personal jurisdiction over it.

The court then addresses whether venue is proper in the U.S. District Court for the District of Columbia.  To do so, the court interprets the scope of the Foreign Sovereign Immunities Act's ("FSIA") venue provision, 28 U.S.C. § 1391(f), and concludes that dismissal of this case is warranted in the alternative for lack of venue.

### A.   Personal Jurisdiction

#### 1.   *A Foreign State's Agency or Instrumentality*

The "FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court."  *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)). The FSIA chips away at a foreign state's sovereign immunity by listing actions that may be brought against a foreign state; if a plaintiff brings one of the listed actions, the court has subject matter jurisdiction over the dispute and, potentially, personal jurisdiction over the foreign defendant.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).

The statute defines a "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  To qualify as "[a]n 'agency or instrumentality of a foreign state,'" the entity must be (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"; and (3) "neither a citizen of a State of the United States . . . nor created under the laws of any third country."  *Id.* § 1603(b).  Courts afford entities that qualify as an "agency or instrumentality" a "presumption of independent status" from the foreign sovereign.  *Foremost-*

*McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* (*Bancec*), 462 U.S. 611, 626–27 (1983) ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."), *abrogated on other grounds by* 28 U.S.C. § 1610.

Here, there is no genuine dispute that SCOP is an instrumentality of Iraq. Indeed, Petitioner concedes it. Pet. ¶ 5 (alleging that "Respondent is an 'instrumentality' within the meaning of section 1603(b)(2)" of the FSIA). By law, SCOP "enjoy[s] a corporate status" that is separate from Iraq, and it is "fully owned by the state." Resp't's Br., Decl. of Nowell D. Bamberger in Supp. of Resp't's Mot. to Dismiss the Pet. to Confirm Arbitration Award, Ex. A, ECF No. 19-1 [hereinafter Iraq State Companies Law No. 22], at ch. 1, art. 1. SCOP is further not a citizen of any state of the United States or a third country because it is incorporated and domiciled in Iraq. Pet. ¶ 3; *see* 28 U.S.C. § 1332(c)(1). SCOP therefore meets the statutory standard for an instrumentality.

2.    *The Availability of Due Process Protections for Agencies and Instrumentalities*

Having determined that SCOP is an instrumentality of Iraq, the court must next determine whether SCOP is nonetheless separate from Iraq for jurisdictional purposes. If so, SCOP is entitled to the protections of the Due Process Clause of the Fifth Amendment. Courts have interpreted the Due Process Clause to apply differently to foreign states than to a foreign state's juridically separate agency or instrumentality. Where a foreign state itself is a party to a suit, "'[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under' § 1603(a) 'where service has been made under' § 1330(b)." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (quoting

28 U.S.C. § 1330(b)).  Put simply, "subject matter jurisdiction plus service of process equals personal jurisdiction" over a foreign state.  *Id.* (quoting *Price*, 294 F.3d at 95).  That ends the jurisdictional analysis as to foreign states, and a foreign state is *not* entitled to constitutional due process protections.  *See Price*, 294 F.3d at 96 ("[W]e hold that foreign states are not 'persons' protected by the Fifth Amendment.").

In contrast, where an agency or instrumentality of a foreign state is the defendant, the Fifth Amendment's due process protections may apply, and, if so, jurisdiction will lie only if a defendant has sufficient contacts with the forum.  In *Bancec*, the Supreme Court announced that, consistent with principles of international comity, "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status"—that is, a "separate legal status" from the foreign state.  462 U.S. at 626–28; *see also Foremost-McKesson*, 905 F.2d at 446.  The D.C. Circuit has subsequently held that if the "presumption" of separateness between an agency or instrumentality and a foreign state is not rebutted, the agency or instrumentality is entitled to due process protections under the Fifth Amendment.  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005).[3]

To overcome the presumption of separateness, OGI Group bears the burden of asserting facts establishing that SCOP is "'so extensively controlled by its owner that a relationship of principal and agent is created' or [that] 'broader equitable principle[s]' dictate that separate

---

[3] OGI Group cites to *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184 (D.C. Cir. 2003), for the proposition that, "as long as subject-matter jurisdiction exists under the FSIA and service was proper," there is no need to consider whether jurisdiction is consistent with due process. Pet.'s Opp'n at 2–3.  OGI Group misreads *I.T. Consultants*.  There, the D.C. Circuit considered whether it had personal jurisdiction over a foreign state—the Republic of Pakistan.  *I.T. Consultants*, 351 F.3d at 1191.  The court noted that, because "foreign states are not 'persons' protected by the Fifth Amendment," it did not need to determine whether asserting jurisdiction over Pakistan was consistent with the Due Process Clause of the Fifth Amendment.  *Id.* (quoting *Price*, 294 F.3d at 96).  But the rule articulated in *I.T. Consultants* does not govern a court's personal jurisdiction, as here, over an instrumentality.  It is the law of this Circuit that juridically separate instrumentalities are "person[s]" protected by the Fifth Amendment, and therefore jurisdiction over instrumentalities must be consistent with due process.  *TMR Energy Ltd.*, 411 F.3d at 301.

treatment 'would work fraud or injustice.'" *GSS Grp. Ltd.*, 680 F.3d at 814 (quoting *Bancec*, 462 U.S. at 629); *Foremost-McKesson*, 905 F.2d at 447 (noting this showing is the petitioner's burden). This inquiry "is not a searching one," and to overcome the presumption of separateness, the state's control over the corporation must "significantly exceed[] the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amount[] to complete domination of the [corporation]." *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000). The inquiry focuses on whether the state has "day-to-day involvement in the affairs of the instrumentality." *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 211 (D.D.C. 2014) (internal quotation marks omitted); *see also Transamerica Leasing*, 200 F.3d at 851–52.

But before turning to whether OGI has defeated the presumption of separateness, the court must first consider OGI Group's argument that, in addition to SCOP, the Ministry of Oil is also a Respondent in this case. OGI Group suggests that, because SCOP's full name ("Oil Projects Company of The Ministry of Oil, Baghdad, Iraq (SCOP)") includes the words "Ministry of Oil," Iraq's Ministry of Oil is a party to these proceedings. *See* Pet.'s Opp'n at 2 ("SCOP alone is not the Respondent in this case."); *id.* at 2–3 ("The Respondent in the Arbitration was not 'SCOP,' but rather 'Oil Projects Company of The Ministry of Oil, Baghdad, Iraq (SCOP).'"); *id.* at 3 ("The underlying contract . . . was not just with SCOP but rather was between Petitioner and 'Oil Projects Company of The Ministry of Oil, Baghdad, Iraq (SCOP).'"). This argument is not well taken. Other than the fact that SCOP's full name contains the words "Ministry of Oil," OGI Group supplies no evidence that the Ministry of Oil was a party to the contract or the arbitration, or is a named respondent in its own Petition. In fact, all proof is to the contrary. There is only one counterparty to the contract—"State Company for Oil Projects." Contract at 33. The respondent

8

identified in the arbitration's Terms of Reference and in the arbitration decision is a single entity—
"Oil Projects Company of the Ministry of Oil, Baghdad, Iraq (SCOP)."  Aff./Add'l Ex. to Steven
Jones Decl., Ex. B, ECF No. 6, at 6; Aff./Add'l Ex. to Steven Jones Decl., Ex. C – Part 1, ECF
No. 7, at 7.  And the case caption and description of the parties in the Petition refer to a single
respondent—"Oil Projects Company of The Ministry of Oil, Baghdad, Iraq (SCOP)."  *See* Pet. ¶ 3.
The Ministry of Oil is nowhere listed as a separate party.  The court's only jurisdictional inquiry
therefore concerns whether it has personal jurisdiction over SCOP.

On that question, the parties focus their arguments regarding the presumption of
separateness on SCOP's enabling law, Iraq's Law No. 22 of 1997 on State Companies ("State
Companies Law").  *See* Resp't's Br. at 6; Pet's Opp'n at 5.  The State Companies Law, which
authorizes state-owned corporations, was passed to "organiz[e] the activity of self-financed state
economic organizations" and provide uniform laws enabling state companies to "organiz[e] their
work in such a way as to contribute to the advancement of the national economy and to achieve
the social aims of the socialist sector."  Iraq State Companies Law No. 22.  The Law creates a
separate corporate identity for state companies by defining a "state company" as "[t]he economic
unit which is self-financed, fully owned by the state, enjoying a corporate status, independent
financially and administratively, and functioning on economic bases."  *Id.* at ch. 1, art. 1.

OGI Group relies on various aspects of SCOP's relationship to Iraq, as laid out in the State
Companies Law, to contend that SCOP is "an agent or alter ego of the Republic of Iraq."  Pet.'s
Opp'n at 4.  Its arguments focus on two main attributes:  SCOP's corporate governance structure
and its economic relationship with the state.

As to SCOP's corporate governance structure, OGI Group argues that Iraq extensively
controls SCOP because: (1) Iraq wholly owns SCOP, (2) the Iraqi cabinet appoints SCOP's general

manager, and (3) Iraq's Minister of Oil appoints six of the eight members of SCOP's board of directors.  *Id.* at 5.  The D.C. Circuit, however, has held that such indicia of corporate "control" are insufficient to overcome the presumption of separateness.  In *Transamerica Leasing, Inc. v. Republica de Venezuela*, the D.C. Circuit considered allegations that a state-owned airline was "dominated" by Venezuela because the country, among other things, "owned a majority of [the corporation's] stock" and "appointed the Board of Directors and the Chairman of the Board and President."  200 F.3d at 850.  The court held that these "two facts—that the Government owned [the corporation's] stock and could appoint [the corporation's] Board of Directors and the Chairman and President—are relevant but as a matter of law do not by themselves establish the required control."  *Id.* at 851; *see also Foremost-McKesson*, 905 F.2d at 448 ("Majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal to agent under FSIA."); *de Csepel v. Republic of Hungary*, No. 1:10-cv-1261, 2020 WL 2343405, at *9 (D.D.C. May 11, 2020), *appeal docketed,* No. 20-7047 (D.C. Cir. June 10, 2020).  The same holds true here.  Although Iraq's majority ownership and the ability to appoint directors suggest some control, they do not demonstrate that the state exercises the degree of day-to-day control over SCOP that is necessary to overcome the presumption of separateness.

Nor does OGI Group's argument that Iraq dominated SCOP by appointing SCOP's general manager gain better traction.  Pet.'s Opp'n. at 5.  In *Transamerica Leasing*, the D.C. Circuit concluded that a foreign state, as the "sole shareholder" of a state-owned company, must be able to "exercis[e] its influence . . . to put its own chosen manager in charge of a corporation" without being construed to assume control over the corporation's day-to-day operations.  *See* 200 F.3d at 851.  If a foreign state's appointment of a manager were enough to overcome the presumption of

10

separateness, the court reasoned, "the holding of *Foremost–McKesson* that majority stock ownership and control over the Board of Directors are insufficient to transform parent to principal and instrumentality to agent would be limited to cases in which the shareholder is utterly quiescent." *Id.* "[L]et it exert itself at all to protect its interests and it loses its legal identity separate from that of the corporation. That is not the law." *Id.*

OGI Group's arguments concerning SCOP's economic relationship with Iraq similarly do not move the needle. First, OGI Group argues that SCOP is Iraq's agent because "SCOP's capitalization is approved by the Republic of Iraq at the cabinet level and paid by the Treasury." Pet.'s Opp'n at 5. While it is true that financial autonomy is often a hallmark of a separate juridical entity, a state's provision of capital "constitute[s] a 'normal aspect' of [the state and company's] relations, 'not an instance of "day-to-day" involvement in the affairs of the [instrumentality].'" *DRC, Inc.*, 71 F. Supp. 3d at 211 (quoting *Transamerica Leasing*, 200 F.3d at 852); *see also Bancec*, 462 U.S. at 624 (listing as a "common feature[]" of "separately constituted legal entities" that "[e]*xcept for appropriations to provide capital or to cover losses*, the instrumentality is primarily responsible for its own finances" (emphasis added)). Accordingly, the fact that Iraq capitalizes SCOP, and Iraq's cabinet must approve that capitalization, is not evidence that Iraq controls SCOP's day-to-day business.

Finally, Petitioner argues that SCOP is not autonomous from the state because "[f]orty-five percent of [SCOP's] profits revert to the Iraqi Treasury." Pet.'s Opp'n at 5. But this fact does not compel the court to override the separate legal status of SCOP for two reasons.

First, Iraq is the sole shareholder of SCOP. Like a shareholder that receives a dividend when it invests in a successful company, Iraq is entitled to a portion of SCOP's profits as a return on its investment. Indeed, it is a "necessary corollary" of the settled principle that a state and its

instrumentality are presumed to be separate that the "sovereign . . . may derive benefits from" its ownership of a state corporation "yet still avoid amenability to suit in United States courts." *DRC, Inc.*, 71 F. Supp. 3d at 218.  Put more plainly, the very point of a government-owned corporation is to "achieve the economic goals of the state," *GSS Grp. Ltd. v. Republic of Liberia*, 31 F. Supp. 3d 50, 66 (D.D.C. 2014), *aff'd GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598 (D.C. Cir. 2016), while distancing the corporation from close political control and rigid agency regulations that are routine for state activity, *Bancec*, 462 U.S. at 624–26.

Second, OGI Group has not connected Iraq's profit sharing to any alleged exercise of control over SCOP's daily business.  That is, the Petition and OGI Group's Opposition are devoid of any allegations or facts suggesting that Iraq has dictated that SCOP enter certain contracts or make specific business decisions to maximize the state's return.  *See EM Ltd. v. Banco Cent. de la Republica Arg.*, 800 F.3d 78, 93 (2d Cir. 2015) ("Missing from plaintiffs' allegations are any claims that Argentina's appointment of board members then caused it to interfere in and dictate [the corporation's] daily business decisions."); *DRC, Inc.*, 71 F. Supp. 3d at 201 (discussing a foreign state's financial connection to its corporation as a "'normal aspect' of their relations" that did not amount to day-to-day management of the company (quoting *Transamerica Leasing*, 200 F.3d at 852)).  Indeed, the State Companies Law provides that SCOP is "independent financially and administratively" from Iraq, suggesting that Iraq does not interfere with SCOP's daily affairs to maximize its profits.  State Companies Law No. 22, ch. 1, art. 1.  Without evidence that Iraq manages the daily business of SCOP in connection with its collection of profits, there is no basis to conclude that Iraq and SCOP are "act[ing] as one" or that "the affairs of [Iraq and SCOP are] so intermingled that no distinct corporate lines are maintained." *Transamerica Leasing*, 200 F.3d

at 848–49; *cf. EM Ltd.*, 800 F.3d at 93 (holding that "an exercise of power incidental to ownership . . . is not synonymous with control over the instrumentality's day-to-day operations").

*   *   *

Viewing these attributes of SCOP as a whole, the court finds that OGI Group has failed to plausibly allege that SCOP "is so extensively controlled by [Iraq] that a relationship of principal and agent is created." *GSS Grp. Ltd.*, 680 F.3d at 814. OGI Group has not alleged facts showing the type of day-to-day involvement that is necessary for a foreign state and its corporation to "act as one" and form a "single enterprise." *Transamerica Leasing*, 200 F.3d at 848. In the absence of such factual allegations, this court cannot break with the rule "that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Bancec*, 562 U.S. at 626–27.[4] Because SCOP "does not act as an agent of the state, and separate treatment would not result in manifest injustice," SCOP is entitled to "all the due process protections available to private corporations." *GSS Grp. Ltd.*, 680 F.3d at 815.

### 3.    The Due Process Clause

The court therefore proceeds to consider whether, under the Due Process Clause of the Fifth Amendment, SCOP has the necessary minimum contacts for this court to exercise personal jurisdiction over it. "Personal jurisdiction may take the form of general or specific jurisdiction." *Sharp Corp. v. Hisense USA Corp.*, 292 F. Supp. 3d 157, 169 (D.D.C. 2017). Neither party has suggested that specific jurisdiction, which looks to whether the suit arises from an "activity or occurrence that takes place in the forum State," *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017), applies here. Indeed, no apparent ground for specific jurisdiction

---

[4] OGI Group has not suggested that manifest "injustice" would result from refusing to assert personal jurisdiction over SCOP, and this court identifies no such injustice. *See Bancec*, 462 U.S. at 629–32; *see also GSS Grp. Ltd.*, 680 F.3d at 815.

exists, as the underlying contract is between a Canadian company and an Iraqi company, was to be performed in Iraq, and has no apparent connection to the United States. *See* Pet. ¶¶ 10–11; Resp't's Br. at 5. The court thus focuses on OGI Group's allegations regarding general jurisdiction. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002) (determining specific jurisdiction did not exist and continuing to analyze general jurisdiction).

General jurisdiction will lie based on "only a limited set of affiliations with [the] forum." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). General jurisdiction based on a corporation's business within a forum is thus "only permissible if the defendant's business contacts with the forum district are 'continuous and systematic.'" *Gorman*, 293 F.3d at 509–10 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)).

The "paradigm" examples of a corporation's "continuous and systematic" contacts are its "place of incorporation" and "principal place of business." *Daimler*, 517 U.S. at 137. To state the obvious, neither of these paradigm examples are present here: the United States is not SCOP's place of incorporation or principal place of business. *See* Pet. ¶ 3; Resp't's Br. at 1.

However, "[t]he exercise of general jurisdiction is not limited to" those paradigmatic instances. *BNSF Ry. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017). "[I]n an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *Id.* (quoting *Daimler*, 571 U.S. at 139 n.19); *see also Pinkett v. Dr. Leonard's Healthcare Corp.*, No. 18-cv-1656 (JEB), 2018 WL 5464793,

at *2 (D.D.C. Oct. 29, 2018) (finding corporate defendant's contacts with forum were not the 'exceptional case' where the corporation's contacts made it "at home" in the District of Columbia (quoting *BNSF Ry.*, 137 S. Ct. at 1552–53)).  Determining whether a corporation's contacts in a forum give rise to general jurisdiction cannot rest alone on "the magnitude of the defendant's in-state contacts," but instead "calls for an appraisal of a corporation's activities in their entirety." *BNSF Ry.*, 137 S. Ct. at 1559 (quoting *Daimler*, 571 U.S. at 139 n.20).  This is because "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Id.*

OGI Group argues that this court has general jurisdiction over SCOP because "Iraq through the Ministry of Oil exports significant quantities of petroleum and petroleum products to the United States." Pet.'s Opp'n at 5.  In support, OGI Group attaches to its brief a chart of Iraq's oil exports to the United States and notes that the United States imported "124,284 thousand barrels of petroleum and petroleum products" from Iraq, which OGI Group estimates amounts to $7.95 billion dollars in sales.  Pet.'s Opp'n at 5; Decl. of Stephen Z. Starr, ECF No. 21 [hereinafter Starr Decl.], Ex. B, ECF No. 21-2.

These factual allegations are insufficient for two reasons.  First, while OGI Group has offered data on U.S. petroleum imports from Iraq generally, it has not specified whether SCOP sold or produced any of the petroleum that data accounts for.  In fact, OGI Group attached to its Opposition a list of no fewer than 23 other companies that it purports are wholly owned by Iraq's Ministry of Oil.  Starr Decl., Ex. A, ECF No. 21-1; *see also* Pet.'s Opp'n at 4–5.  OGI Group has not offered any evidence to show that SCOP, and not any of the Ministry of Oil's 23 other companies, is responsible for all or any specific portion of Iraq's oil exports to the United States. Because this court has already determined that SCOP is juridically independent from Iraq, Petitioner cannot exploit *Iraq*'s composite contacts with the United States to manufacture general

jurisdiction over SCOP; indeed, it is SCOP's due process rights that have engendered the inquiry in the first place. *See TMR Energy Ltd.*, 411 F.3d at 301 (noting corporation must have "separate and distinct" identity from foreign sovereign to receive protections of the Due Process Clause).

Second, even if all the petroleum exports could be attributed to SCOP, OGI Group still fails to plausibly establish that SCOP is "at home" in the United States to confer general or all-purpose jurisdiction over it. *See BNSF Ry.*, 137 S. Ct at 1559. As noted, courts must evaluate a "corporation's activities in their entirety" to evaluate whether general jurisdiction might obtain. *BNSF Ry.*, 137 S. Ct. at 1559 (quoting *Daimler*, 571 U.S. at 139 n.20). But here, OGI Group has offered no factual allegations or evidence of SCOP's activities outside the United States that would enable the court to evaluate the significance of the company's presence within the United States. Without evidence of the magnitude of SCOP's contacts outside the jurisdiction, this court is unable to conclude that SCOP is at home in the United States. It would therefore be inconsistent with the limits of due process for this court to exercise general jurisdiction over SCOP.

### B.    Venue

SCOP also moves to dismiss the Petition on the alternative ground that this court is not a proper venue. Resp't's Mot. at 7–13. OGI Group disputes this, arguing that venue is proper under 28 U.S.C. § 1391(f)(4). Pet. ¶ 9. Although the court has determined that it lacks personal jurisdiction over SCOP, it addresses the venue argument in the interest of completeness.

Section 1391(f) is the venue provision of the FSIA.[5] It provides, among other things, that "a civil action against a foreign state" may be brought "in the United States District Court for the

---

[5] Section 1391(f) reads in its entirety:

> **Civil actions against a foreign state**--A civil action against a foreign state as defined in section 1603(a) of this title may be brought--

16

District of Columbia if the action is brought against a foreign state or political subdivision thereof."
28 U.S.C. § 1391(f).  SCOP argues that this provision makes the U.S. District Court for the District
of Columbia the appropriate venue for only those suits brought against a foreign state itself or its
political subdivision—not for suits brought, as here, against a foreign state's instrumentality.
Resp't's Br. at 9.  OGI Group does not tackle SCOP's interpretation of Section 1391(f)(4) head
on, but instead reprises its argument that SCOP and Iraq are one in the same and that Iraq's
petroleum exports to the United States support venue in this forum.  *See* Pet.'s Opp'n at 6.  Having
already concluded that those arguments are unpersuasive, the court will not dwell on them here.

While this court is the first in this District to analyze whether Section 1391(f)(4) applies to
a foreign state's instrumentality, two other courts in this District have addressed the issue in
passing.  *See Century Int'l Arms, Ltd. v. Fed. State Unitary Enter. State Corp.*, 172 F. Supp. 2d
79, 87 n.8 (D.D.C. 2001) ("Defendant qualifies under the statute as a 'foreign state or political
subdivision thereof,' because 'a foreign state includes an agency or instrumentality of a foreign
state,' and it is undisputed that [the defendant] is an agency or instrumentality of Russia."
(alterations omitted) (citation omitted) (internal quotation marks omitted)); *Elahi v. Islamic
Republic of Iran*, 124 F. Supp. 2d 97, 106 n.9 (D.D.C. 2000) ("[T]he federal venue statute provides
that actions against a foreign state and a state's agent or instrumentality may be brought in the

---

(1) in any judicial district in which a substantial part of the events or omissions
giving rise to the claim occurred, or a substantial part of property that is the subject
of the action is situated;
(2) in any judicial district in which the vessel or cargo of a foreign state is situated,
if the claim is asserted under section 1605(b) of this title;
(3) in any judicial district in which the agency or instrumentality is licensed to do
business or is doing business, if the action is brought against an agency or
instrumentality of a foreign state as defined in section 1603(b) of this title; or
(4) in the United States District Court for the District of Columbia if the action is
brought against a foreign state or political subdivision thereof.

28 U.S.C. § 1391(f).

United States District Court for the District of Columbia.").  In each of these cases, the parties did not dispute venue, and the court addressed the issue with a summary, one-sentence conclusion. Accordingly, while this court is conscious that it is not writing on a clean slate, it resolves whether venue is appropriate primarily via independent application of the principles of statutory interpretation.

The court turns first to the text of the statute.  *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ."). "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) (quoting *Lamie*, 540 U.S. at 534). Section 1391(f)(4) provides that an action under the FSIA may be brought "in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof."  28 U.S.C. § 1391(f)(4).  The question before this court, therefore, is whether a state's instrumentality, such as its wholly-owned corporation, is included within the ambit of "a foreign state or political subdivision thereof" for purposes of Section 1391(f)(4).

The FSIA defines a "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Based on this definition, one could interpret Congress's use of "foreign state" in Section 1391(f)(4) to include its agencies and instrumentalities.  But to do so, one would need to excise the term "foreign state" from its context.  Section 1391(f)(4) applies to both "a foreign state" *and* a "political subdivision thereof." 28 U.S.C. § 1391(f)(4).   If Congress intended the term "foreign state" as found in Section 1391(f)(4) to bear the definition ascribed to it in Section 1063(a), the words "or political subdivision thereof" would have been redundant.  That is because the definition of "foreign state"

18

in Section 1603(a) already includes "political subdivision[s]."  Applying the full definition of "foreign state" in Section 1063(a) to Section 1391(f)(4) therefore would mean that "political subdivision thereof" appears twice in the venue provision.  Such constructions are disfavored. *See United States v. Palmer*, 854 F.3d 39, 48 (D.C. Cir. 2017) (stating that "courts are to interpret congressional statutes in a way to avoid surplusage"); *City of Mesa v. FERC*, 993 F.2d 888, 893 (D.C. Cir. 1993) ("Whenever possible, we will not interpret a statute in such a way as to cause redundancy." (quoting *United States v. Barker Steel Co.*, 985 F.2d 1123, 1131 (1st Cir. 1993))).

In addition, reading the clause in the context of Section 1391 and the broader FSIA statutory scheme reinforces that Congress did not intend Section 1391(f)(4) to apply to instrumentalities.  *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context with a view to their place in the overall statutory scheme." (internal quotation marks omitted)).

First, in another clause of the same provision at issue here, Congress specified a venue for cases brought against "an agency or instrumentality of a foreign state."  Specifically, Section 1391(f)(3) provides that venue is appropriate "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, *if the action is brought against an agency or instrumentality* of a foreign state as defined in section 1603(b) of this title."  28 U.S.C. § 1391(f)(3) (emphasis added).  Read together, Sections 1391(f)(3) and 1391(f)(4) demonstrate that Congress envisioned different venues would be appropriate for agencies and instrumentalities than for foreign states and political subdivisions.  The D.C. Circuit recognized as much in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, when it observed that the FSIA contains a

"distinction" between "two categories of actors"—foreign states and their instrumentalities—that "appears in the venue provisions of 28 U.S.C. § 1391." 30 F.3d 148, 152 (D.C. Cir. 1994).

The legislative history confirms this reading. The legislative history from the 1976 amendment creating Section 1391(f) notes that Section 1391(f)(4) applies to foreign states and political subdivisions because "[i]t is in the District of Columbia that foreign states have diplomatic representatives and where it may be easiest for them to defend." H.R. Rep. 94-1487, at 32, 1976 U.S.C.C.A.N. 6604, 6631; 1976 WL 148078. While a state or political subdivision is likely to have diplomats and representatives in the District of Columbia, a foreign instrumentality's representatives are most likely to be found in the state in which the instrumentality is licensed to do business—not necessarily the District of Columbia. Accordingly, unlike for a foreign state or political subdivision—where a foreign state's diplomats are the key actors—for an instrumentality with its own corporate staff, the District of Columbia is no more likely to be home to the relevant corporate personnel than any other forum in the United States. Sections 1391(f)(3) and 1391(f)(4) indicate that Congress codified this distinction between a foreign state and its political subdivision and a foreign state's agencies or instrumentalities.

Second, the FSIA distinguishes between a foreign state, its political subdivisions, and its agencies and instrumentalities in numerous other provisions—indicating that the word "foreign state" is not always intended to refer collectively to a foreign state's political subdivisions and agencies and instrumentalities. *See Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 195 (D.D.C. 2006) (noting instances in which the FSIA draws distinctions between an "agency or instrumentality" and the "foreign state"). Specifically, the FSIA distinguishes between a "foreign state" and an "agency or instrumentality" in the following ways:

20

(1) permitting an agency or instrumentality, but not a foreign state or political subdivision, to be liable for punitive damages, 28 U.S.C. § 1606;[6]

(2) providing different requirements for service of process on agencies and instrumentalities than on foreign states or political subdivisions, *id.* § 1608;[7]

(3) limiting a foreign state's ability to invoke sovereign immunity where property that is taken in violation of international law, or property that is exchanged for property taken in violation of international law, is owned or operated by the foreign state's agency or instrumentality, *id.* § 1605(a)(3);[8] and

(4) enumerating instances in which an agency or instrumentality may be uniquely susceptible to the attachment of property, in addition to the seven instances in which the property of a "foreign state" may be attached, *id.* § 1610.[9]

The provisions throughout the FSIA that distinguish between a foreign state and an agency or instrumentality are strong indicators that Congress occasionally intended the term "foreign state" to refer exclusively to the state itself—and not to instrumentalities. *See Transaero*, 30 F.3d at 151–52.

Accordingly, consistent with the plain statutory text read in its context, this court concludes that Section 1391(f)(4) is limited to a foreign state and its political subdivisions and does not apply to a foreign state's instrumentalities. Venue therefore does not lie in the District of Columbia under Section 1391(f)(4). Additionally, OGI Group has not argued that "a substantial part of the events or omissions giving rise to the claim occurred" in this District or that SCOP is "licensed to

---

[6] Section 1606 provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity . . . , the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but *a foreign state except for an agency or instrumentality thereof* shall not be liable for punitive damages . . . ."

[7] Section 1608(a) describes the requirements for service of process "upon a foreign state or political subdivision of a foreign state," while Section 1608(b) lists the different requirements for service of process "upon an agency or instrumentality of a foreign state."

[8] Section 1605(a)(3) provides in relevant part that a foreign state shall not be immune in any case "in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

[9] Section 1610(a) describes exceptions to immunity from attachment or execution with respect to "[t]he property in the United States of a foreign state, as defined in section 1603(a) of this chapter," and Section 1610(b) describes additional exceptions to such immunity for "any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States."

do business or is doing business" in the District.  *Id*. § 1391(f)(1), (3).  Venue is therefore improper in the District of Columbia.

**V.     CONCLUSION**

For the foregoing reasons, Respondent's Motion to Dismiss the Petition to Confirm an Arbitration Award, ECF No. 19, is hereby granted.  A separate final Order accompanies this Memorandum Opinion.

Dated:  October 29, 2020                                      Amit P. Mehta
                                                      United States District Court Judge

22